CHARLES H. HIGGINS and Another, Copartners, etc., Appellants, *v.* THE G. PIEL COMPANY, INC., and Another, Respondents.

*Contracts — building contracts — estimate of cost of construction not agreed to by architect not binding on him — discharge of architect is breach of contract — liens — mechanic's lien — architect's lien limited to work performed before discharge — architect has no lien for damages for breach of contract — notice of lien filed within four months after architect certified bill, which was paid by defendant on such certification, but not within four months from date of discharge, is within statutory period — notice is invalid which does not state agreed price of labor or value thereof.*

Appeal from part of a judgment of the Supreme Court in favor of the plaintiffs, entered in the Queens county clerk's office May 20, 1922, upon the report of a referee.

Judgment in so far as appealed from unanimously affirmed, with costs, on the opinion of Hon. Edward B. Thomas, official referee. Present — Kelly, P. J., Jaycox, Manning, Young and Kapper, JJ.

The following is the opinion of the official referee:

THOMAS, Referee: The G. Piel Company, Inc., herein referred to as defendant, manufacturers of accessories for automobiles, rented a building therefor, but wished to construct a factory of their own, and in July, 1919, engaged plaintiffs as the architects. The transactions were largely with Charles H. Higgins. The

factory then occupied and the machinery installed in it provided opportunities for visualizing in a helpful degree the necessities of the proposed new structure in respect to space, the floor loads, the convenience demanded in operation, and for learning other matters fundamental or incidental, and Higgins studied them, aided and advised by Gottfried Piel, the president, or his son, Arthur, vice-president of the company, and the matter in its varied aspects was the subject of discussion with one or both Piels. Convenience was an essential of the undertaking, and there were two other underlying requisites, space and strength. The site admitted of a building meeting the requirement either by carrying two stories over the whole of it, or by erecting a six-story building over half of it or some other appropriation of the space. The matter of cost had its own importance and the implied agreement was that it should not be greater than the nature and purpose of the building required, together with such architectural features as the owners wished, but no limit was fixed that should preclude plans for a building that would comprehend what was needed. Moreover, the owners were interested in some display of architecture that would meet the proper adornment and engage the eye of the public. So a tower and some matters of decoration were provided in the plans, but all that was subject to the predominant expression in the plans of the essentials enumerated. The complete plans were not delivered until January, 1920, at which time the current of increasing prices had set in to inflate the cost of construction far above the rates imposed by the war, and the peak was not reached until July, 1920. Gottfried Piel testified that on January twenty-fifth, at his house, where were grouped with him his son, the Lyons Brothers, and Charles H. Higgins, he announced that he could not go on with the work if it would cost more than $250,000, and that after asking Lyons what it would cost and receiving the answer " $3 a square foot," he turned to Higgins and asked " what he had to say — he said in a very low voice * * * ' It cannot cost more.' " Arthur Piel gives some corroboration to his father's testimony as to this incident, but the others present do not, and Higgins denies that he assented to the Lyons estimate. The defendants insist that Higgins guaranteed that construction under his plans would not cost over $250,000, or that at the meeting he assented to Lyons' estimate, or was silent when he should have spoken and denounced it This is not a question for moralizings or casuistry but of naked legal rights, and thereby, I conclude that Piel had no legal right on January twenty-fifth to an opinion from Higgins, which, if faulty, should subject plaintiffs to damages, nor if Higgins was a mere auditor of Lyons' estimate should Piel be permitted to construe such silence as an approval of defendant contractor's estimate. Arthur Piel testified that in September, 1919, Higgins presented to him preliminary plans and stated that the cost would be from $240,000 to $260,000 and that there was no other statement as to the cost by Higgins before the conference on January twenty-fifth, but on October twenty-eighth there was presented to the broker to secure a loan a statement that the cost of the building would be at least $300,000, and Lyons testified that in September and October the cost of the construction would have been $325,000. It is clear that Piel did not understand that he would build at the cost of $240,000 to $260,000, and that such a limit was not fixed, and I consider that it is impossible to find that Gottfried Piel understood on January twenty-fifth that the cost would be no more than $250,000. Hence I prefer Higgins' recollection that he did not state an estimate of the cost to the Piels.

There were two possible methods for learning as the more probative, what the work would cost. By one the architect could, by diligent search, learn the cost of all the material, item by item, cost of labor, of overhead, superintendence, accessories, and incidentals, and all the detailed information could be blended into some kind of an *ensemble*. By the other method bids could be invited either for the whole work or for parts. In my judgment the architect was not required by any duty to pursue the first method, and the second course the Piels prevented them from adopting by letting the work to friends of the Lyons family. Indeed that precluded plaintiffs from observing either method. But defendant Piel Company's argument now comes to this, that Higgins should have been equipped to warn defendant against relying on the estimate that Lyons made by defendant's engagement, although Lyons' opinion was not announced to Higgins until the terms of the contract with Lyons had been arranged, but not reduced to the form of written contract. That would have required of Higgins instantaneous decision and dispute with Lyons, who was not only an experienced builder, but also the estimator and builder defendant had selected. In my judgment the defendant, so far as it relied on either, depended on the person who had been asked to estimate, and who did estimate, and such person was Lyons, who it will be observed quite wisely refused to build save on the cost plus plan, which in 1919-1920 was safe for the contractor but very hazardous for the owner. The result of the views expressed leads to the conclusion that the plaintiffs are entitled to recover damages for the discharge, whatever the date of it. But I am not in accord with plaintiffs' contention in regard to the amount or the lien therefor. The plaintiffs ceased to be the architects when the letter of July 8, 1920, came to hand, unless there was some further recognition of them as such. The contract then was broken, and a cause of action at once arose for the value of the broken contract. All that the plaintiffs had contributed to the building, or could contribute, became fixed as of the date of discharge, including of course obligations plaintiffs had incurred or assumed under arrangement. Plaintiffs had contributed to the building by the plans and supervision, and whatever work accompanied the construction as it advanced. But after the letter reached them they had no power to add something more, except as the relation was revived, and did not. It was correct conduct to hold themselves in readiness and to exhibit their disposition by going to the work in the attitude of service. But beyond that Higgins' proceeding was mere vain effort, and did not for an instant of time extend the professional relation. When was the letter received by the plaintiffs — one or both? In the due course of mail it was received presumptively by July tenth and confirmed what purported to be a discharge by the owners' attorney on July sixth. Hence, on this trial the presumption of fact becomes sufficient evidence that it was so received. The notice of lien for the work done, that had merged in the building, was not filed within four months thereafter. But it is urged that the plaintiffs after the receipt of the letter did an act falling within their contract and that the defendant recognized it, and that dating from that time the lien was duly filed. Work was done in June, 1920, by Columbia University, upon the order of Higgins, and the bill therefor dated July 6, 1920, was sent to Higgins, who inclosed it to defendant in a letter dated July fifteenth, together with a certificate for payment signed " original signed by Charles H. Higgins, architect," and on July 21, 1920, the Piel Company answered: " Replying to your favor of the 15th inst., we are paying

bill oɪ the Columbia University, dated July 6th and amounting to $28.00, because the same was contracted prior to your notice of dismissal, and it in no way recognizes the continuance of your employment subsequent to the date of said notice." It may be that it did not recognize the employment between the date of receipt of the letter of July eighth and July fifteenth or July twenty-first, but it did recognize that on July fifteenth Higgins had acted as the architect to certify the bill, and that pursuant to receipt of the certificate and the bill defendants sent the check to pay the bill through Higgins. Higgins in the whole matter was acting as an agent for the Piel Company and the only agency inherent in his capacity was as architect. The transaction was an item of service done by him as architect and the notice of lien filed within four months thereafter was within statutory time.* The defendants could not use him and deny him in relation to the same act, nor are they entitled to a gratuitous service from him. The notice of lien in terms was for work performed, save as to a part. The statute† does not permit liens for work to be performed, but for work performed, albeit not as fully performed as the plaintiffs were entitled to perform it had they not been discharged. I gather that the underlying principle of the Lien Law is that if a man's commodities or labor has gone into a structure or has been provided to go in, the value of the property has been so much enhanced, or, at least, that there has been such contribution to the value of the property. There may be a contract that would, if continued, enable the person to make further additions to the land or building, but that is entirely executory, and an intangible right inhering in contract. Until it takes physical form and is adapted to the property by installation or in some degree provided for a place in the structure it is not *in esse*, and is incapable of contact with the building. All that plaintiffs had done properly as architects up to the date of discharge, in whatsoever fragmentary state it may be, became in legal contemplation an integral element in the structure. After such penetration, if I may use the expression, of the lienor's property into the mass of the structure, or, as I have said, after it is in progress for such articulations, the person supplying may have a choice of time for filing the lien, as his work progresses, after the work is done, or after the contract is completed, limited of course by the statutory time. But if the work be ended and the contract be ended by breach on the part of the owner the other party cannot keep his time going by reliance on a contract under which he had not been permitted to proceed, however wrongful the prevention. But what had plaintiffs contributed to the building at the time of the discharge, whether it was before July tenth or of the date of defendant's letter recognizing plaintiffs for the purpose of the Columbia University's bill? It is clearly established that plaintiffs were to have six per cent on the cost of the building. The cost was, disregarding for the moment some smaller items, $464,274.16, hence the commission would be $27,856.45. Plaintiffs have been paid $16,191.53, leaving an unpaid balance of $11,664.92, and if to this be added unpaid sums for Fox's salary, $1,270.87, and unpaid balance for blueprints, $350.70, the unpaid sum becomes $13,286.49 with interest from August 1, 1920. I find nothing inconsistent with this view except plaintiffs' bill of January twenty-ninth, which would serve as nothing

---

* See Lien Law, § 10, as amd. by Laws of 1916, chap. 507.—[REP.

† See Lien Law, § 3; Id. § 9, as amd. by Laws of 1916, chap. 507.—[REP.

more than a declaration had not the defendants paid it, thereby, it may be argued, indicating accord with its terms and theory. The defendants show by an abundance of evidence that upon their questioning it, Higgins explained that it was intended to demand payment once for all for the plans. The Piels are doubtless skilled in their own business, but the technique of the bill would come slowly and doubtfully to their minds, and they must have relied upon their architects' assurance that they were in some proper way making a charge in consonance with the contract that had been made with the plaintiffs. The bill shows that it was not the intention to segregate the service for the plans from the entire work, but that for their entire work they were asking for the payment of one-half of the commission for all their work upon the signing of the Lyons' contract, using as a tentative basis the estimated cost, which might be increased or decreased. The bill covered supervision for the period before January twenty-seventh (the date of the Lyons' contract) and after January twenty-ninth Higgins sent defendants at least one bill based upon the rate of three per cent of the work as it had further progressed. What then did plaintiffs intend to charge upon the completion of the first half? Would it be six per cent of $250,000, assuming that to be the cost? If so their final bill would be $15,000. But they demanded that sum as of January twenty-seventh, and were adding to it and did add to it, until before their discharge they had collected $16,191.53 as applicable to this main cost. The conclusion is inevitable that they intended to charge more than six per cent on the cost of the first half, thereby receiving commission for some part of the assumed cost of the second half. If they were demanding only payment of six per cent on the cost of the first half their January twenty-ninth payment would have been for $7,500, less earlier payment. Therefore, they intended to cast upon the unbuilt portion a like sum. But plaintiffs and Piel testified that the contract was that plaintiffs should receive six per cent on the cost of the building. The January twenty-ninth bill is at plain variance with that clear agreement. True, the bill of January twenty-ninth as made and paid has some evidentiary force, but it cannot override the initial contract, which the parties on this trial state provided for six per cent on the cost of the construction. But it is urged that on breach of the contract plaintiffs could recover as damages the commissions on the whole work, done and not done, and the notice of lien and the figures on the submission presented by plaintiffs follow that theory. That bases damages on an option. The arrangement clearly was that defendants could build the second half according to their unrestricted choice, and whether they abstained from the building from convenience or whim, the right to be capricious even was absolute. The defendants' present proposition in effect is that, although they might never build, and were under no obligation to build, yet when plaintiffs were discharged from building the first half the option to build the second half took on some obligations upon which plaintiffs could rest a claim. The plaintiffs may contend that their plans had some reference to the second half. True, the second half could follow the plan of the first half, but whatever adaptability there was in that regard, plaintiffs agreed to be satisfied with six per cent on what actually was built. What the plaintiffs' right would be, if defendants should build on plaintiffs' plans need not be determined in this action. Something that may never be and something that the defendants may lawfully prevent from ever being is as unsubstantial as a vision. It is going to the full limit of justice to allow the plaintiffs what the report directs.

But the question is still unanswered, how much of the above sum remaining unpaid was such a contribution to the building when plaintiffs were discharged as to afford a lien provided the notice of lien be deemed valid; and what part of it is for mere breach of contract — for which of course there can be no lien? The notice of lien is erroneous in its theory in that it seeks a lien for recovery based on a breach of contract, and also in claiming a lien for services on the second half of the building. The notice is for work performed, excepting that to be performed in supervision. It was impossible to foresee what the full cost of completion would be of a building in course of erection, and impossible to know the cost of a building that possibly might never be erected. But the plaintiffs could estimate what percentage had been constructed when they were discharged, and what percentage of their whole claim the future supervision would be. Could any person know from the notice what the value of the work performed was? That was an essential thing to publish. The notice gives the value of the whole sum claimed, but not the value of the unperformed supervision. Hence the value of the work performed could not be known to those interested and having a right or interest to know. And I find the same trouble in the present record — what part of the whole sum due was contributed to the building so as to enable the amount of the lien to be ascertained? The plaintiffs have not proceeded on that theory, but demand a lien for the entire sum, extending it even to the second non-existent and, for all that is known, never to exist second half. It may be determined that half of the commissions were due January twenty-seventh, but if so that sum was paid, because they did not amount to $15,000, even figured on $44,274.16. How much was earned after January twenty-ninth to the date of discharge, and did the payments cover that — did they more than pay it, or how may the account be stated? The question is insoluble under the evidence, at least I find no reliable basis of computation, and the plaintiffs' theory is so inconsistent with my conclusion that the plaintiffs have not lent any aid to the solution. As the notice of lien does not state the agreed price of the labor performed or the value of it the statute was not followed and for that reason at least the notice is invalid. But even if it were valid the value of the labor performed when plaintiffs were discharged has not been proven, and I cannot find what it is. The findings state the amount of the unpaid commissions on the cost of the building as constructed by Lyons, and I allow the additional unpaid minor sums of $1,270.87 and $350.70. Fox was furnished by agreement with plaintiffs and in the midst of the work defendants sought to deprive plaintiffs of his assistance, and whether plaintiffs themselves thereafter employed Fox or continued his employment under defendants, the defendants should pay for his labor.